1  Lionel Z. Glancy (Bar No. 134180)
   Peter A. Binkow  (Bar No. 173848)
2  Michael Goldberg (Bar No. 188669)
   GLANCY BINKOW & GOLDBERG LLP
3  1801 Avenue of the Stars, Suite 311
   Los Angeles, California 90067
4  Telephone:(310) 201-9150
   Facsimile:(310) 201-9160
5  E-mail: info@glancylaw.com

6  Hollis L. Salzman (pro hac vice)
   E-mail: hsalzman@labaton.com
7  Gregory S. Asciolla (pro hac vice)
   E-mail: gasciolla@labaton.com
8  William V. Reiss (pro hac vice)
   E-mail: wreiss@labaton.com
9  LABATON SUCHAROW LLP
   140 Broadway
10 New York, NY 10005
   Telephone:   (212) 907-0700
11 Facsimile:   (212) 818-0477

12 *Attorneys for Plaintiff and the Proposed Class*
   *Additional Counsel Listed on Signature Page*
13

14                 UNITED STATES DISTRICT COURT
15           FOR THE CENTRAL DISTRICT OF CALIFORNIA

16 ACE MARINE RIGGING & SUPPLY,
   INC., on behalf of itself and all others
17 similarly situated,
                                          SACV10-01553 AG
18                              Plaintiff,                    MLGx
   
19             vs.

20 TRELLEBORG AB; VIRGINIA
   HARBOR SERVICES, INC. D/B/A
21 SEAWARD; SII, INC.; SHI, INC.;
   FENTEK MARINE SYSTEMS GMBH;    **CLASS ACTION COMPLAINT**
22 URETHANE PRODUCTS
   CORPORATION; MARINE FENDERS
23 INTERNATIONAL, INC.; WATERMAN
   SUPPLY COMPANY, INC.; MARITIME
24 INTERNATIONAL, INC.; FRANK
   MARCH; ROBERT B. TAYLOR;
25 DONALD MURRAY; PETER NILSSON;
   GERALD THERMOS; SEYMOUR
26 WATERMAN; JOHN DEATS; TOMAS
   CRAWAACK; AND FENDERCARE
27 LIMITED,
                              Defendants.
28

CLASS ACTION COMPLAINT

1  Plaintiff Ace Marine Rigging & Supply, Inc. ("Plaintiff"), on behalf of itself
2  and all others similarly situated, brings this action for treble damages, injunctive
3  relief and costs of suit under the antitrust laws of the United States against
4  Trelleborg AB; Virginia Harbor Services, Inc. d/b/a SEAWARD; SII, Inc. (f/k/a
5  Seaward International, Inc.); SHI, Inc. (f/k/a Seaward Holdings, Inc.); Fentek
6  Marine Systems GmbH; Urethane Products Corporation; Marine Fenders
7  International, Inc.; Waterman Supply Company, Inc.; Maritime International, Inc.;
8  Frank March; Robert B. Taylor; Donald Murray; Peter Nilsson; Gerald Thermos;
9  Seymour Waterman; John Deats; Tomas Crawaack; and FenderCare Limited
10  ("Defendants") and allege, on information and belief, but on personal knowledge
11  as to allegations relating to Plaintiff, as follows:

12  **NATURE OF CLAIM**

13  1.    This case arises from a conspiracy to fix, raise, maintain and/or
14  stabilize prices, rig bids and allocate the market in the United States for foam-filled
15  marine fenders and ancillary products ("Foam-Filled Fenders") and foamed-filled
16  buoys and ancillary products ("Buoys") (together, "Foam-Filled Fenders and
17  Buoys"). It is part of three related and overlapping conspiracies involving several
18  marine products, including plastic marine pilings and ancillary products and
19  marine fenders and ancillary products other than foam-filled fenders, including
20  fixed fenders and pneumatic fenders. The three conspiracies were intertwined and
21  consisted of many of the same Defendants, including corporate entities and
22  individuals.

23  2.    As a result of this illegal conspiracy, Defendants charged supra-
24  competitive prices for Foam-Filled Fenders and Buoys in the United States,
25  thereby injuring Plaintiff Ace Marine Rigging & Supply, Inc. and members of the
26  Class (defined below).

27
28

3.     A number of Defendants in this action have already pleaded guilty to and/or settled similar claims in related actions alleging the same anticompetitive conduct.

4.     Defendants Virginia Harbor Services, Inc., Frank March, Robert B. Taylor, Donald Murray, and Gerald Thermos have pleaded guilty to engaging in a conspiracy to unlawfully rig bids and allocate markets for the sale of Foam-Filled Fenders and Buoys pursuant to a criminal investigation launched by the United States Department of Justice's Antitrust Division ("DOJ").

5.     These guilty pleas have resulted in substantial fines and/or prison sentences for a number of the Defendants.

6.     Additionally, on July 22, 2009, the DOJ intervened in a pending qui tam lawsuit brought by whistleblower Douglas Farrow, a current executive of Defendant Urethane Products Corporation.

7.     The qui tam lawsuit, which was filed in 2005, was partially unsealed by Judge George H. Wu of the U.S. District Court of the Central District of California on February 19, 2010.

8.     On February 26, 2010, the DOJ announced that it had negotiated settlements with several of the Defendants in the qui tam action totaling approximately $15.4 million.  Defendant Trelleborg AB and four of its subsidiaries agreed to pay $14 million to settle the qui tam action that alleged they participated in an unlawful conspiracy to fix prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys, among other marine products, purchased by the U.S. Navy and other federal departments and agencies.  Defendant Frank March agreed to pay $1 million to settle the qui tam action.

9.     In addition, with the DOJ's approval, Douglas Farrow, the relator in the qui tam action, settled with Defendants Gerald Thermos and Marine Fenders International, Inc., as well as named co-conspirator Larry Lizotte, for $100,000.

1        10.    Also on February 26, 2010, the State of Florida announced that

2    Defendant Virginia Harbor Services, Inc. and its predecessor, Trelleborg

3    Engineered Products, Inc., agreed to pay $707,000 to several public port authorities

4    in Florida, including the Port of Palm Beach, the Tampa Port Authority and the

5    City of Key West to settle claims that the companies conspired to allocate

6    business, rig bids and fix prices of marine equipment, including Foam-Filled

7    Fenders.

8                      **JURISDICTION AND VENUE**

9        11.    This action arises under Section 1 of the Sherman Act and Sections 4

10   and 16 of the Clayton Act, 15 U.S.C. §§ 1 and 15 and 26.

11       12.    This Court has jurisdiction under Sections 4 and 12 of the Clayton

12   Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1331 and 1337.

13       13.    Venue is proper in this District pursuant to Sections 4 and 12 of the

14   Clayton Act, §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d).  Defendants

15   are found and transact business in the District and/or the claims arose at least in

16   part in the District.  Defendants regularly and continuously conduct business in

17   interstate and commerce.  The interstate trade and commerce relevant to this action

18   has been carried out, in part, within the District.

19                         **PARTIES**

20       14.    Plaintiff Ace Marine Rigging & Supply, Inc. ("Ace Marine") is a

21   North Carolina corporation with its headquarters in Morehead City, North

22   Carolina.  During the Class Period (defined below), Ace Marine purchased Foam-

23   Filled Fenders and/or Buoys directly from one or more of the Defendants and was

24   damaged as a result of the Defendants' and their co-conspirators' unlawful

25   conduct.

26       15.    Defendant Trelleborg AB (a/k/a Trelleborg Group) ("Trelleborg") is a

27   business organization with headquarters in Trelleborg, Sweden and business

28   operations at locations throughout the world, including the United States and

1  Germany.  Trelleborg AB is comprised of four business units that each provide
2  polymer or rubber products to a broad range of industries.  Trelleborg AB's marine
3  operations are organized within the Trelleborg Engineered Systems ("TES")
4  business unit.  Trelleborg's participation in and acts in furtherance of the unlawful
5  conspiracy resulted in foreseeable anticompetitive effects in this District and the
6  United States.

7        16.     Defendant SII, Inc. (f/k/a Seaward International, Inc.) ("SII") is a
8  corporation organized under the laws of the State of Virginia, with offices located
9  in Clear Brook, Virginia.  SII's participation in and acts in furtherance of the
10  unlawful conspiracy resulted in foreseeable anticompetitive effects in this District
11  and the United States.

12        17.     Defendant SHI, Inc. (f/k/a Seaward Holdings, Inc.) ("SHI") is a
13  corporation organized under the laws of the State of Virginia, with offices located
14  in Clear Brook, Virginia.  Plaintiffs are informed and believe that SHI acquired SII
15  in 1999 and that SHI dominates and controls SII.  The term "Seaward" herein
16  refers to SHI and SII together.  Until its acquisition by Trelleborg in December
17  2002, Seaward was one of the largest producers of Foam-Filled Fenders and Buoys
18  in the United States.  Plaintiffs are informed and believe that most of SHI's assets
19  and operations, including the Seaward Foam-Filled Fenders and Buoys
20  manufacturing operation, were acquired by Trelleborg Engineered Products, Inc.
21  ("TEP") around December 2002.  SHI's participation in and acts in furtherance of
22  the unlawful conspiracy resulted in foreseeable anticompetitive effects in this
23  District and the United States.

24        18.     Defendant Virginia Harbor Services, Inc. (d/b/a SEAWARD) is a
25  corporation organized under the laws of the State of Delaware, with its principal
26  place of business located in Clear Brook, Virginia.  Virginia Harbor Services, Inc.,
27  previously known as TEP, is a corporate subsidiary of Trelleborg.

28

19.     On or about July 25, 2007, Trelleborg caused TEP to change its name to Virginia Harbor Services, Inc.  Unless stated otherwise, Virginia Harbor Services, Inc. shall hereafter be referred to as "VHS".

20.     On or about December 2002, VHS acquired the business interests of Seaward.  Selling under the "Seaward" brand, Defendant VHS is one of the world's leading manufacturers and suppliers of Foam-Filled Fenders and Buoys.  VHS's participation in and acts in furtherance of the unlawful conspiracy resulted in foreseeable anticompetitive effects in this District and the United States.

21.     Defendant Fentek Marine Systems GmbH ("Fentek") is a business organization with its headquarters in Hamburg, Germany and offices in different locations throughout the world, including an office in the State of Virginia.  Fentek is part of TES and, upon information and belief, is a wholly-owned business unit of Trelleborg.  Since approximately 2001, Fentek has been dominated and controlled by Trelleborg.  Between at least approximately 2001 through 2006, Tomas Crawaack was the company's president.  Prior to 2001, Tomas Crawaak was the principal owner and operator of Fentek.  Fentek's participation in and acts in furtherance of the unlawful conspiracy resulted in foreseeable anticompetitive effects in this District and the United States.

22.     Defendant Frank March ("March") is the majority shareholder of SHI.  He was the majority shareholder of SII before it was acquired by SHI.  March actively participated in and implemented and also directed and authorized the wrongful conduct, hereinafter alleged, by Seaward and VHS.  In or around December 2002, March authorized the sale of Seaward's operations to Trelleborg (or one of its business units) for approximately $10 million.  March's participation in and acts in furtherance of the unlawful conspiracy resulted in foreseeable anticompetitive effects in this District and the United States.

23.     Defendant Robert (a/k/a "Bob") B. Taylor ("Taylor") was the principal owner and operator of co-conspirator ProMar between 1997 and 1998.  In

1  1999, ProMar was acquired by SHI.  Taylor thereafter served as President of SHI

2  and held a minority interest in SII.  Around December 2002, following

3  Trelleborg's acquisition of certain of SHI's assets and operations, including the

4  Seaward Foam-Filled Fenders and Buoys manufacturing business, Taylor was

5  employed as the President of VHS and sat on its board.  Taylor, like March,

6  actively participated in and implemented and also directed and authorized the

7  unlawful conduct by Seaward and later VHS described herein.  Defendant Taylor

8  authorized and directed VHS to continue engaging in the unlawful practices

9  described herein after Trelleborg through VHS acquired Seaward's operations.

10  Taylor's participation in and acts in furtherance of the unlawful conspiracy resulted

11  in foreseeable anticompetitive effects in this District and the United States.

12      24.    Defendant Donald Murray ("Murray") was Chief Financial Officer

13  ("CFO") of Seaward and thereafter obtained a similar position at VHS after the

14  acquisition of Seaward's operations by Trelleborg.  Murray also sat on the board of

15  VHS during the Class Period.  Murray actively participated in and implemented the

16  unlawful conduct described herein.  Murray's participation in and acts in

17  furtherance of the unlawful conspiracy resulted in foreseeable anticompetitive

18  effects in this District and the United States.

19      25.    Defendant Peter Nilsson ("Nilsson") is the current president of

20  Trelleborg.  Nilsson was President of TES between approximately June 1, 2003

21  and October 1, 2005.  Nilsson actively participated in and implemented the

22  unlawful conduct described herein.  Nilsson's participation in and acts in

23  furtherance of the unlawful conspiracy resulted in foreseeable anticompetitive

24  effects in this District and the United States.

25      26.    Defendant Marine Fenders International ("MFI") is a corporation

26  organized under the laws of the State of California, with its principal place of

27  business located in Wilmington, California.  Defendant MFI is engaged in the

28

1   business of manufacturing, distributing and selling Foam-Filled Fenders and

2   Buoys.

3          27.    Defendant Urethane Products Corporation ("UPC") is a corporation

4   organized under the laws of the State of California, with its principal place of

5   business located in Bellflower, California.  UPC manufactures, distributes and sells

6   Foam-Filled Fenders and Buoys and other marine products made from

7   polyethylene foam core with a polyurethane elastomer skin.

8          28.    Defendant Gerald Thermos ("Thermos") is an individual presently

9   residing in Seal Beach, California.  Thermos is the former president of UPC and

10  now owns and operates MFI in Wilmington, California.  Thermos actively

11  participated in and implemented the unlawful conduct described herein and

12  directed and authorized the unlawful conduct by UPC and MFI.

13         29.    Defendant Waterman Supply Company, Inc. ("WSC") is a corporation

14  organized under the laws of the State of California, with offices located in

15  Wilmington, California.  Defendant Waterman is a leading dealer, distributor and

16  manufacturer's representative for Foam-Filled Fenders and Buoys.  Additionally,

17  Waterman supplies manufacturers with end-fittings, or "hardware," which are

18  necessary components in producing Foam-Filled Fenders and Buoys.

19         30.    Defendant Seymour Waterman ("Waterman"), an individual presently

20  residing in Rancho Palos Verdes, California, is the principal owner of WSC.

21  Waterman actively participated in and implemented the unlawful conduct

22  described herein and directed and authorized the unlawful conduct engaged in by

23  WSC.

24         31.    Defendant Maritime International, Inc. ("Maritime International") is a

25  corporation organized under the laws of the State of Louisiana.  Maritime

26  International's participation in and acts in furtherance of the unlawful conspiracy

27  resulted in foreseeable anticompetitive effects in this District and the United States.

28

CLASS ACTION COMPLAINT                                                    8

1   32. Defendant John Deats ("Deats") is the owner of Maritime

2 International.  Deats actively participated in and implemented the unlawful conduct

3 described herein and directed and authorized the wrongful conduct engaged in by

4 Maritime International described herein.  Deats' participation in and acts in

5 furtherance of the unlawful Foam-Filled Fenders and Buoys conspiracy resulted in

6 foreseeable anticompetitive effects in this District and the United States.

7   33. Defendant Tomas Crawaack ("Crawaack") was a board member of

8 VHS during the Class Period.  Crawaack was also the President of Fentek, which is

9 part of the TES division of Trelleborg.  Crawaack actively participated in and

10 implemented the unlawful conduct described herein.  Crawaack resides in

11 Germany, but has conducted business in this District during the Class Period,

12 including the commission of the unlawful conduct described herein.  Crawaack's

13 participation in and acts in furtherance of the unlawful conspiracy resulted in

14 foreseeable anticompetitive effects in this District and the United States.

15   34. Defendant FenderCare Limited ("FenderCare") is a business entity

16 based in Norfolk, Great Britain.  FenderCare's participation in and acts in

17 furtherance of the unlawful conspiracy resulted in foreseeable anticompetitive

18 effects in this District and the United States.

19        **NAMED CO-CONSPIRATORS**

20   35. Co-conspirator Nextwave Marine LLC ("Nextwave") is a limited

21 liability company formed in June 2001 by UPC and SHI, with offices located in

22 Houston, Texas.  Between at least June 2001 and December 2002, Nextwave

23 knowingly acted as an agent of Seaward and UPC with respect to the wrongful

24 conduct described herein.  Nextwave participated in the conspiracy to fix, raise,

25 maintain and/or stabilize prices, rig bids and allocate markets for Foam-Filled

26 Fenders and Buoys.  Upon information and belief, Nextwave does not presently

27 exist as a legal entity.

28

---

CLASS ACTION COMPLAINT               9

36.     Co-conspirator ProMar (a.k.a. ProMar LLC or ProMar Corp.) is a business entity with offices located in Clearwater, Virginia, and offices formerly located in Kearneysville, West Virginia and Fort Worth, Texas.  In 1999, SHI acquired ProMar.  Promar participated in the conspiracy to fix, raise, maintain and/or stabilize prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys.  Upon information and belief, Promar does not presently exist as a legal entity.

37.     Co-conspirator Larry Lizotte ("Lizotte") is an individual who was formerly employed at Defendant UPC as a manager from approximately 2000 through April 2004.  In April 2004, he joined Defendant MFI.  Lizotte participated in the conspiracy to fix, raise, maintain and/or stabilize prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys.

38.     Co-conspirator Max Mougan ("Mougan") is an individual employed by Defendant WSC during the Class Period as a manager.  Mougan participated in the conspiracy to fix, raise, maintain and/or stabilize prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys.

## UNNAMED CO-CONSPIRATORS

39.     Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the unlawful acts complained of, and performed acts and made statements in furtherance of the unlawful conduct.

## INTERSTATE TRADE AND COMMERCE

40.     Throughout the Class Period, there has been a continuous and uninterrupted flow of sales of Foam-Filled Fenders and Buoys in interstate commerce.

## THE FOAM-FILLED FENDERS AND BUOYS INDUSTRY

41.     Foam-Filled Fenders are structural protection products that have both high energy absorption and low reaction force.  These marine devices protect ship-to-ship and ship-to-dock applications by limiting the amount of force applied to

dock structures during berthing and mooring.  Foam-Filled Fenders are an integral part of protecting large multi-use docks, wharves and piers.  They require minimal upkeep and maintenance.  Foam-Filled Fenders are equipped with permanent end fittings made of steel ("hardware"), so that the Foam-Filled Fenders can be mounted to vessels and/or berthing facilities.

42.     Buoys are used in a variety of applications, including as channel markers and navigational aids

43.     Foam-Filled Fenders and Buoys have peculiar characteristics and uses as compared to other types of marine fenders and buoys.  These devices are fabricated from a resilient foam that allows them to absorb impact without damage to either vessel or buoy, and makes these products unsinkable, even if punctured.  Due to this internal energy absorption, vessels will not rebound from the berth.  Additionally, foam-filled marine products are protected by a thick outer polyurethane elastomer skin, which makes them far more resistant to the degrading effects of chemicals, ozone and oil than are other types of fendering systems.

44.     During the Class Period, Seaward (subsequently VHS), UPC and MFI were the dominant manufacturers of Foam-Filled Fenders and Buoys used for commercial applications in the United States.

## THE CONSPIRACY

45.     Beginning at least as early as June 2000, Defendants and their co-conspirators entered into and agreed to participate in a continuing conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain or stabilize prices, rig bids and allocate the market and/or customers for Foam-Filled Fenders and Buoys in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

46.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain

and/or stabilize the price of, rig bids and allocate the market and/or customers for Foam-Filled Fenders and Buoys in the United States.  These activities included:

> (a)     Attending meetings or otherwise engaging in discussions in the United States and elsewhere by telephone, facsimile and electronic mail regarding the sale of Foam-Filled Fenders and Buoys;

> (b)     Agreeing during those meetings and discussions to allocate shares of the Foam-Filled Fenders and Buoys market among Defendants and their co-conspirators and to create and exchange order logs in order to implement and monitor the agreement;

> (c)     Agreeing during those meetings and discussions not to compete for one another's customers by either not submitting bids to certain customers, or submitting intentionally high prices or bids to certain customers;

> (d)     Agreeing to charge prices for Foam-Filled Fenders and Buoys at specified levels and to allocate the market and/or customers and otherwise fixing, increasing, maintaining and/or stabilizing the price of Foam-Filled Fenders and Buoys sold to purchasers in the United States;

> (e)     Submitting bids in accordance with the agreement;

> (f)     Selling Foam-Filled Fenders and Buoys to customers in the United States and elsewhere at collusive and non-competitive prices pursuant to the agreement;

> (g)     Accepting payment for Foam-Filled Fenders and Buoys to customers in the United States and elsewhere at collusive and non-competitive prices pursuant to the agreement;

> (h)     Authorizing or consenting to the participation of employees and/or distributors in the conspiracy;

> (i)     Concealing the conspiracy and conspiratorial contacts through various means; and

1     (j)     Communicating with one another to discuss the prices,

2   customers, markets, market shares and price levels of Foam-Filled Fenders and

3   Buoys in the United States.

### Thermos, UPC, March, Taylor, and Seaward

5     47.     UPC was founded in 1976 by Timothy Thermos.  Upon his death in

6   1995, ownership of the company was transferred to his wife Elizabeth Thermos.

7   At or about the same time, their son, Defendant Gerald ("Jerry") Thermos took

8   over as UPC's President, a capacity in which he continued to serve until

9   approximately April 2004.

10    48.     Between the mid-1990s and April 2004, Seaward (subsequently VHS)

11  and UPC were the dominant manufacturers of Foam-Filled Fenders and Buoys in

12  the United States.

13    49.     Thermos served as President and Managing Director of UPC from

14  1995 until his resignation on or about April 28, 2004.

15    50.     In early 1999, March, Seaward and Thermos communicated with each

16  other regarding a so-called consulting agreement, which March had presented to

17  Thermos.  The draft consulting agreement proposed an arrangement between UPC

18  and Seaward, by which the two would share confidential competitive information

19  about bids and other information on pending projects.  Thermos told March in a

20  February 1999 letter that he had been advised by UPC's antitrust counsel that the

21  agreement was inappropriate and not acceptable.  He indicated that "UPC cannot

22  and will not discuss with you, any information concerning the pricing, terms or

23  conditions of any bid, or our decision as to whether or not we intend to bid on a

24  particular project."

25    51.     Notwithstanding Thermos' February 1999 letter, conspiratorial

26  discussions between the parties resumed.  In or around June 2000, Thermos met

27  with, among others, March and Taylor (ProMar, then Seaward) in Baltimore,

28  Maryland.  March subsequently wrote to Thermos regarding the meeting and the

terms of a proposed agreement pursuant to which Seaward and UPC would divide the United States market for Foam-Filled Fenders and Buoys as follows: 70% to Seaward and 30% to UPC. As part of the agreement, March's letter proposed a payment of $3 million dollars by Seaward to Thermos personally as compensation for "consulting services."

52.     On or about August 15, 2000, Taylor wrote to Thermos concerning the ongoing discussions regarding the proposed so-called "joint venture" between Seaward and UPC. The letter outlined terms acceptable to Seaward, noting that Seaward's management and owners had reviewed the main points at issue remaining between the parties. Among the terms referenced in the letter and its attachment was the same 70/30 production split previously referenced by March. An agreement was memorialized soon thereafter.

53.     Pursuant to their unlawful agreement, Seaward (later VHS) and UPC coordinated their pricing and bids throughout the Class Period on projects so as to: (i) distribute their cumulative manufacturing work 70% to Seaward (later VHS) and 30% to UPC, and (ii) raise the price for their products. Such a result was possible because Seaward (later VHS), UPC and/or their distributors were frequently the only Foam-Filled Fenders or Buoys suppliers bidding on the Foam-Filled Fenders and Buoys projects.

54.     The primary individuals responsible for the day-to-day execution of the unlawful scheme were Taylor at Seaward (later VHS) and Thermos at UPC. In furtherance of the scheme, Taylor and Thermos regularly exchanged correspondence concerning proposed bids, pricing and related matters during the Class Period.

55.     During the Class Period, price lists for Foam-Filled Fenders and Buoys sold by the two companies were frequently identical for comparable products.

56.     The prices charged by UPC and Seaward pursuant to the foregoing

price-fixing, bid-rigging, and market allocation scheme were systematically inflated beyond the competitive prices that otherwise would have been charged absent the unlawful agreement.

57.     In or about 2001, UPC and Seaward (prior to its being purchased by VHS), under the direction of Thermos and Taylor and with the knowledge and acquiescence of Seaward's CEO March, established a joint venture called Nextwave. Although Nextwave purported to be a legitimate joint venture, in reality it was established as a vehicle to unlawfully fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and/or customers in the United States for Foam-Filled Fenders and Buoys. Seaward and UPC used Nextwave to eliminate competition by allocating customers and dividing up the contracts that they wanted to win.

58.     The terms of Nextwave's operating agreement ("Operating Agreement") gave representatives of Seaward and UPC unfettered control over Nextwave. Each company had the ability to appoint one manager to oversee the operations of Nextwave. The managers then had the authority to select officers to operate Nextwave. The Operating Agreement named SHI's President Taylor as a manager and president of Nextwave, and it named UPC's President Thermos as manager and vice-president of Nextwave.

59.     The Operating Agreement contained explicit provisions outlining an unlawful arrangement by which Seaward and UPC would divide the market for products sold by Nextwave between the two companies.   Article 7 of the Agreement, entitled "Company Business," contained the following language:

> 7.1    Allocation of Product Orders All orders for Products of the Company shall be allocated to each Member for production in the discretion of the Managers pursuant to the Sales Representation Agreement, subject to the following:

(a) Base Line Products[1] - Seventy Percent of the production of Base Line Products shall be allocated to Seaward and thirty percent (30%) of such production shall be allocated to UPC.

(b) Other Products - All production of Products other than Base Line Products shall be allocated equally to each Member, or as agreed by the Managers.

7.5   Product Pricing The Company shall sell the Products at such prices and on such terms as the Managers may determine in their sole and absolute discretion.

60.   Pursuant to the terms of the Operating Agreement and their pre-existing agreement, Seaward and UPC divided the market for the products in accordance with the Operating Agreement.

61.   In order to keep track of the allocation of projects between Seaward and UPC, Seaward (and later VHS) generated "Order Logs" that identified the production value of contracts awarded to UPC and Seaward (later VHS) through the course of the year.

62.   In fiscal year 2001, the Order Log generated by Seaward reflected $4,107,627.04 in total orders, with 64.68% being allocated to Seaward and 35.32% being allocated to UPC, as previously agreed.

63.   In fiscal year 2002, the Order Log generated by Seaward had a total cumulative order value of $15,652,774.25 (including revenues from the previous year) with adjusted allocations of 68.09% going to Seaward and 31.91% going to UPC.

64.   The Order Log for fiscal year 2002 (which contained entries through November 18, 2002) provided for "Future Orders to Balance to 70/30," and specified that $973,704.18 in orders would go to Seaward to achieve the agreed-upon 70/30 ratio.

---

[1]   "Base Line Products" are defined in Exhibit B to the Agreement as "Foam Filled Fenders" and "Surface Buoys."

1    65.    The Order Log for 2002 further stated that Nextwave sales constituted

2    22.98% of the total sales by the two entities as of November 18, 2002, but sales by

3    UPC and Seaward outside of Nextwave were still considered in calculating the

4    70/30 split in production.

5    66.    Before, during, and after the period of Nextwave's existence, both

6    UPC and Seaward systematically bid directly and indirectly on all projects as if

7    they were independent competitors, without revealing their price-fixing, bid-

8    rigging and market allocation scheme to their customers.

9    67.    Nextwave was paid hundreds of thousands of dollars in commissions

10   on its sales by UPC and Seaward.

11   **VHS**

12   68.    In or around December 2002, Trelleborg acquired most of SHI's

13   assets and operations (including the Seaward Foam-Filled Fenders and Buoys

14   manufacturing business) and discontinued SHI's participation in Nextwave.

15   However, Trelleborg continued to participate in the ongoing price-fixing, bid-

16   rigging, and market allocation scheme with UPC through its subsidiary VHS,

17   which took over the operations of Seaward.

18   69.    In fiscal year 2003, VHS generated an Order Log reflecting the same

19   70/30 distribution of work between VHS and UPC.  The Order Log indicated a

20   total cumulative order value of $26,202,700.32 (including revenues from previous

21   years), with adjusted allocations of 68.27% to Seaward (later VHS) and 31.73% to

22   UPC, as previously agreed.

23   70.    The Order Log for 2003 similarly provided for "Future Orders to

24   Balance to 70/30," and specified that $1,486,071.49 in orders would be allocated to

25   Seaward to achieve the agreed-upon 70/30 ratio.

26   71.    VHS produced a similar log for "Pending Projects" in early 2004,

27   which contained the same allocation of projects between UPC and VHS.  Even

28   though the projects had not yet been awarded, the log described the anticipated

division of those projects between the two manufacturers and the estimated price for products.

72.   In the period 2000 through 2002, Thermos regularly communicated with March and Taylor (among others) at Seaward in furtherance of the price-fixing, bid-rigging, and market allocation scheme.  Following Trelleborg's acquisition of SHI's operations in approximately December 2002, Thermos continued to communicate thereafter with Taylor (among others) at VHS in furtherance of the same unlawful scheme.

**WSC and Waterman**

73.   UPC and Seaward (subsequently VHS) typically sold their products directly to customers.  However, they also sold through distributors.  Several of these distributors joined and agreed to participate in the conspiracy.

74.   UPC and Seaward's primary distributor was WSC.  WSC had knowledge of and participated in the price-fixing, bid-rigging, and market allocation scheme for Foam-Filled Fenders and Buoys described herein during the Class Period.

75.   Following the ostensible termination of the Nextwave Operating Agreement by VHS, UPC and VHS arranged numerous sales pursuant to the unlawful agreement with or through WSC.

76.   UPC and VHS implemented this new strategy, at least in part so as to maintain the same ratios of production that had previously been agreed to in, among other things, the Nextwave Operating Agreement.

77.   WSC and its owner Waterman had knowledge of the unlawful price-fixing, bid-rigging, and market allocation scheme and participated in its execution both before and after the termination of the Nextwave Operating Agreement. Correspondence was regularly exchanged between WSC management and Taylor or Thermos, which indicated that WSC and Waterman were well aware of the fact

that UPC and Seaward (later VHS) were sharing confidential pricing information and acting collusively on pending projects.

78.     One example of a project where WSC participated with UPC and Seaward in the price-fixing, bid-rigging, and market allocation scheme was the Earle Naval Weapons Station Facility in Leonardo, New Jersey.  On or about July 16, 2001, WSC's manager Max Mougan requested that Thermos give WSC a quote on 20 Marine Guard Fenders for the Earle facility.  This information was communicated to Taylor by Thermos.  On September 7, 2001, Taylor sent an email to Thermos, suggesting a per unit price that they should bid on the Foam-Filled Fenders, and proposing that they give Mougan a 5% commission on the project.  On or about December 11, 2001, Seaward quoted Midatlantic Construction a price of $25,350 per unit for the Foam-Filled Fenders with domestically produced hardware and $23,650 with imported hardware.  A copy of the bid was later provided by Taylor to WSC.  On January 14, 2002, Midatlantic Construction requested a quote from UPC on the same project.  Thermos sent a quote to Midatlantic Construction, specifying a minimum price of $24,000 per fender.  This information was also provided to WSC.  Pursuant to the unlawful arrangement, WSC priced the Foam-Filled Fenders at $23,600 per fender and was therefore the successful bidder.

79.     Taylor sent a letter on or about January 28, 2002 to Mougan (which was copied to Thermos) reminding Mougan, "[a]s we discussed the plan is to process this order through our JV, Nextwave Marine."  The order was subsequently run through Nextwave, and was entered in the log beside Order Date January 28, 2002 with "Waterman" specified as the customer.

80.     On January 18, 2002, Mougan sent a purchase order to Thermos and Taylor, along with a copy of the agreement showing the price at which the Foam-Filled Fenders had been sold.  On a cover post-it note, he asked that WSC's net cost (*i.e.*, the price per unit WSC would receive) be filled in by "Jerry/Bob".  The

number entered onto the P.O. was "$20,805 each."   In follow-up correspondence to Thermos dated January 29, 2002, Mougan noted that WSC had collected a 5% commission on the sale and that part of the sale price would also pay for hardware supplied by WSC.   Accordingly, the scheme outlined by Taylor in his September 7, 2001 email to Thermos proceeded essentially as planned, with a 5% commission and other benefits going to WSC as a payment for its participation in the scheme.

81.   When WSC purchased products from Nextwave, UPC or Seaward (later VHS) during the Class Period, such purchases were made for distribution to WSC's customers pursuant to the same scheme described above.  WSC and Waterman then profited from commissions on the sales, and WSC profited from the sale of hardware accompanying the products, as WSC was the principal supplier of hardware to both UPC and Seaward (later VHS).

82.   WSC was one of Nextwave's primary customers.  In 2002, almost half of Nextwave's revenues came from sales of products to WSC.  Waterman signed the checks made out to Nextwave by WSC for the Foam-Filled Fenders and Buoys purchased during that period.

**Maritime International and Deats**

83.   Maritime International was another distributor used by UPC and Seaward (later VHS) during the Class Period.

84.   Maritime International and John Deats, its principal, had knowledge of, joined and participated in the unlawful price-fixing, bid-rigging, and market allocation scheme of UPC and Seaward (later VHS) described herein.  Maritime International and Deats bid on projects with the knowledge that UPC and Seaward (later VHS) were coordinating their bids on the same projects in furtherance of the conspiracy. Maritime International and Deats coordinated their bids with UPC and Seaward on the same projects.

85.     One example of Maritime International and Deats' knowledge and participation in the price-fixing, bid-rigging, and market allocation scheme is in an email dated December 12, 2003, wherein Deats wrote to Thermos expressing his concerns about a Seaward bid on a project titled Dakota Bulk.  In his message, he stated, "Seaward quoted $14,500 through a local agent (Spectra)??? What the F?!???!!??? I thought that you all had talked about this job?"

86.     In an email dated September 30, 2003, Deats passed along confidential information concerning another project, then added " [L]et me know if you already know about this (or if Bob told you about it)."

87.     In another email dated November 14, 2002, Deats wrote: "What about the hardware stuff from Bob?? Did ya'll standardize things so that we can begin pricing stuff for you???"

88.     Plaintiffs are informed and believe that "Bob" in both of the foregoing emails refers to Robert Taylor at Seaward.

**FenderCare**

89.     FenderCare sells Foam-Filled Fenders on behalf of Maritime International and had knowledge of, joined and participated in the price-fixing, bid-rigging, and market allocation scheme involving Foam-Filled Fenders and Buoys as well.

**MFI**

90.     Thermos resigned from UPC in April 2004 after a dispute with Elizabeth Thermos concerning the ownership of UPC and alleged misuse of corporate funds by him.

91.     At or about the time of his resignation from UPC, Thermos created MFI, a company that also manufactures Foam-Filled Fenders and Buoys.  MFI was fully operational only weeks after being incorporated.

92.     In or around April 2004, MFI joined the existing conspiracy and agreed to participate in the continuing conspiracy with the other Defendants and co-conspirators during the remainder of the Class Period.

**Fentek and Crawaack**

93.     During the Class Period, Fentek sold Foam-Filled Fenders and Buoys. Fentek joined and agreed to participate in the conspiracy during the Class Period.

94.     Fentek had knowledge of VHS's wrongful conduct described herein and authorized and directed such wrongful conduct through, among others, its President, Crawaak, who also sits on VHS's board.

95.     Crawaack joined in and actively participated in directing and authorizing the price-fixing, bid-rigging, and market allocation scheme described herein involving Seaward (later VHS), UPC and MFI through, among others, meetings, conversations and/or other communications with Thermos and Taylor throughout the Class Period.

96.     In 2004 and 2005, Douglas Farrow spoke with Crawaack regarding UPC on multiple occasions. In those conversations, Crawaack acknowledged that VHS and UPC had coordinated their bidding, and he explicitly expressed a desire for UPC, MFI, and VHS to continue the unlawful price fixing, bid-rigging, and market allocation conspiracy, which they did. Crawaack indicated that his motivation for the continuing arrangement was to increase profitability for the participants in the scheme.

**Larry Lizotte**

97.     Larry Lizotte was employed at UPC's office in Bellflower, California during the Class Period as a manager for the company. Lizotte resigned at or about the time that Thermos left UPC in April 2004, after which he joined Thermos at MFI.

98.     Lizotte was aware of and participated in the ongoing price-fixing, bid-rigging and market allocation scheme as an employee at UPC from approximately

2000 through his resignation in April 2004. Lizotte continued to participate in the price-fixing, bid-rigging, and market allocation scheme after leaving UPC and joining MFI through the end of the Class Period.

99.  Lizotte assisted in the implementation of the scheme by, among other things, preparing collusive bids on projects, communicating with Seaward (later VHS) regarding pending projects, and regularly tracking the projects that were to be divided between the two companies.

100.  For example, on or about August 28, 2001, Seaward faxed to UPC a copy of Seaward's bid on a United States Navy project at Pier 12 in Norfolk, Virginia. The price set forth in Seaward's quote was $595,400 for 26 Foam-Filled Fenders.

101.  Seaward also sent, via the same fax to UPC, a list of plan-holders on the project (*i.e.*, the contractors who might perform the work). Some of the names on the list were checked, some were stricken, and others had "NO" written beside them.

102.  Lizotte prepared a quote on behalf of UPC for the project. The quote was in the amount of $625,950 for the same Foam-Filled Fenders referenced in the Seaward quote. The UPC quote was then sent by Lizotte to the plan-holder names checked on the list provided by Seaward. There was no substantive cost estimating information by UPC pertaining to the project. Consistent with their scheme, the project was subsequently awarded to Seaward.

103.  The logs reflecting the division of projects between UPC and Seaward (later VHS) were kept on Lizotte's computer, among others. The Pier 12 project is reflected in the log as awarded to Seaward with the customer name "Marine Cont. - Pier 12 Norfolk" and an Order Date of October 19, 2001.

**ProMar, LLC**

104.  Taylor created a company named ProMar, LLC in or around 1997, which was engaged in the Foam-Filled Fenders and Buoys business. Promar

1 joined and participated in the unlawful conspiracy to fix, raise, maintain and/or

2 stabilize prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys

3 during the Class Period.

4     105. Taylor operated ProMar in the same manner that he did Seaward.

5 That is, he unlawfully shared confidential pricing information and coordinated bids

6 with competitors in advance of contracts being awarded by customers and without

7 the knowledge of those customers.

8     106. In 1998, ProMar was teaming up with Seaward on bids. On or about

9 December 23, 1998, Taylor wrote to Thermos on behalf of ProMar, expressing his

10 desire to work together. He also discussed ProMar's pending bid at the time on a

11 project in Singapore and separately faxed Thermos a copy of a December 23, 1998

12 letter by ProMar to Bridgestone, which discussed ProMar's possible role in the

13 project.

14     107. On January 11, 1999, Andrew Hill wrote on behalf of ProMar to

15 Thermos. In the letter, Hill stated that, based on his conversations with March and

16 the owners of ProMar, "a consolidation of the industry seems to be important to all

17 of us." He then detailed possible arrangements for merging all of the competitors

18 into one entity.

19     108. On January 15, 1999, Taylor wrote to Thermos, again under ProMar

20 letterhead, to discuss arrangements for March, Taylor and Thermos to meet in Los

21 Angeles. The letter expressed Taylor's desire "to make this work" and his belief

22 that it "can really be good for all of us."

23     109. In 2002, certain of SHI's assets and operations were purchased by

24 VHS, including the Seaward Foam-Filled Fenders and Buoys manufacturing

25 operation.

26     110. During the Class Period, ProMar knowingly filed collusive bids on

27 numerous Foam-Filled Fenders and Buoys projects as part of the ongoing unlawful

28

1    price-fixing bid-rigging, and market allocation scheme involving, among others, its

2    principal Taylor.

3    **Murray**

4    111.   Donald Murray was CFO of Seaward and then moved into a similar

5    position at VHS after the acquisition of Seaward's operations by Trelleborg.

6    112.   Murray joined and participated in the unlawful price-fixing, bid-

7    rigging, and market allocation scheme from January 2002 (and likely earlier)

8    through at least early 2004 (and likely later).

9    113.   Murray participated in preparing the Order Logs described above that

10    were used by Seaward (later VHS) and UPC to coordinate their conspiracy.  On or

11    about January 7, 2002, Murray sent a fax to Thermos' accountant, with the

12    Nextwave Order Log as of that date attached.  On the cover sheet, Murray referred

13    to the log as the "Order Log I keep."

14    114.   The Order Logs used by UPC and Seaward (later VHS) were

15    produced on Excel spreadsheets.  Murray's name appears as the author in the

16    properties section of at least one of the logs/spreadsheets.

17    115.   Murray also participated in the preparation of the logs with knowledge

18    that they were to be used in implementing the unlawful price-fixing, bid-rigging,

19    and market allocation scheme described herein.

20    116.   Murray also prepared financial statements for Nextwave and

21    participated in direct communications with Thermos and his accountant, Neil

22    Xavier, regarding Nextwave's financials.  For example, on or about January 22,

23    2002, Murray sent a fax to Taylor, with the Nextwave order log for 2001 attached.

24    In his message to Taylor, Murray wrote that he had determined the amount of

25    "commissions" to be paid to Nextwave by UPC and Seaward, based on the total

26    sales by the two entities.  He wrote this message while aware of the fact that no

27    orders had even been placed with Nextwave as of that date, i.e., that it was simply

28    a vehicle for allocating sales between the two entities.  Murray's knowledge on this

point is reflected in another fax message he sent on January 7, 2002 to Thermos' accountant Xavier, where Murray wrote the following: "In January there will be actual orders processed through Nextwave.  Through December, everything was on a commission basis."

117.   Murray thus participated in and furthered the conspiracy in which projects were allocated between UPC and Seaward.  The financial data included journal detail reports, which reflected large payments by Nextwave directly to Thermos.

118.   As late as February 21, 2003, Murray was also providing similar financial information regarding Nextwave's operations directly to Thermos.

**Nilsson**

119.   Nilsson is the current president and CEO of Trelleborg.  Nilsson was President of TES between approximately June 1, 2003 and October 1, 2005.  Prior to June 1, 2003, Nilsson was head of VHS.  During the Class Period, Nilsson joined and participated in the unlawful conspiracy to fix, raise, maintain and/or stabilize prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys.

120.   During the Class Period, Nilsson authorized, directed and approved the price-fixing, bid-rigging, and market allocation scheme involving Foam-Filled Fenders and Buoys.  Nilsson directed, encouraged and approved such conduct via multiple communications between at least 2002 and 2004 with other Trelleborg personnel, including, but not limited to Crawaack, who sought and received Nilsson's approval for Trelleborg to participate in the scheme.

121.   Nilsson engaged in communications regarding the price-fixing, bid-rigging, and market allocation scheme, directly or indirectly, with various Defendants who ultimately reported to him at Trelleborg, including Defendants that have pleaded guilty to their participation in conspiracies to fix prices of Foam-Filled Fenders and Buoys.  Nilsson's direction, authorization and approval of this

1   conduct continued throughout the Class Period, including the period after he

2   became president of Trelleborg.

3   **Criminal Pleadings to Date**

4       122.   A number of Defendants have pleaded guilty to participating in a

5   conspiracy to allocate customers and rig bids for Foam-Filled Fenders and Buoys

6   in the United States in connection with a criminal investigation launched by the

7   DOJ.

8       123.   On or about June 9, 2006, Thermos entered into a plea agreement with

9   the DOJ pursuant to which he agreed to plead guilty to "a single count criminal

10  information charging him with participating in a conspiracy to suppress and

11  eliminate competition by allocating customers and rigging bids for contracts of

12  foam-filled marine fenders and buoys in the United States and elsewhere from in or

13  about June 2000, continuing until in or about August 2005, in violation of the

14  Sherman Antitrust Act, 15 U.S.C. § 1."  The plea agreement provided, upon the

15  satisfaction of certain conditions, for the DOJ to recommend that Thermos pay a

16  $50,000 criminal fine and serve a sentence of eight months, including four months

17  in jail and four months of supervised release.  The plea agreement was filed on

18  September 15, 2006.  Thermos was subsequently sentenced to jail time which he

19  has now served.

20      124.   On or about February 14, 2007, Taylor entered into a plea agreement

21  with the DOJ pursuant to which Taylor agreed to "waive indictment and plead

22  guilty to a three count criminal information charging the defendant with: (1)

23  participating in a conspiracy to suppress and eliminate competition by allocating

24  customers and rigging bids for contracts of foam-filled marine fenders and buoys

25  in the United States and elsewhere from at least as early as June 2000, continuing

26  until as late as August 2005, in violation of the Sherman Antitrust Act. 15 U.S.C. §

27  1; (2) participating in a conspiracy to suppress and eliminate competition by

28  allocating customers and rigging bids for contracts of plastic marine pilings in the

United States and elsewhere from at least as early as December 2000 until as late as May 2003, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (3) participating in a conspiracy to corruptly give, offer or agree to give money with the intent to influence an agent of the New York City government in connection with a series of transactions from at least as early as January 2000 until at least December 2002, in violation of 18 U.S.C. §§ 371 and 666."

125.   The plea agreement provided, upon the satisfaction of certain conditions, for the DOJ to recommend that "the Court impose a sentence requiring the defendant to pay to the United States a criminal fine of $100,000 and to serve a jail term of thirty (30) months of incarceration."   The plea was filed on May 10, 2007 in the United States District Court for the Eastern District of Virginia.   Taylor was subsequently sentenced to serve jail time for his offense.

126.   On or about September 5, 2007, Murray entered into a plea agreement with the DOJ, pursuant to which he pleaded guilty to, *inter alia*, the following charges in the criminal information filed against him on the same date: "Beginning at least as early as December 2002 and continuing until as late as January 2004, the exact dates being unknown to the United States, the defendant participated in an ongoing combination and conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere."   The plea was filed in the United States District Court for the Eastern District of Virginia on September 11, 2007. Murray was subsequently sentenced to serve 18 months in prison, fined $75,000, and required to pay $224,269.89 in restitution.

127.   On or about April 20, 2009, VHS entered into a plea agreement with the DOJ, pursuant to which it pleaded guilty to: (i) participating in a conspiracy between December 2002 and August 2005 to allocate customers and rig bids for contracts of Foam-Filled Fenders and Buoys sold in the United States and elsewhere; and (ii) participating in a conspiracy between December 2002 and May

2003 to allocate customers and rig bids for contracts of marine pilings.  The plea was filed in the United States District Court for the Eastern District of Virginia on June 15, 2009.  VHS was subsequently fined $7,500,000.

128.   On June 30, 2009, March entered into a plea agreement with the DOJ, pursuant to which he pleaded guilty to, *inter alia*, the following charges in the criminal information filed against him on the same date: "Beginning in or about June 2001 and continuing until in or about December 2002, the exact dates being unknown to the United States, the defendant participated in an ongoing combination and conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere."   March was subsequently sentenced to 18 months in prison and fined $100,000.

## ALLEGATIONS OF ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

129.   Defendants' unlawful conspiracy had the following anticompetitive effects, among others:

(a)    prices charged to Plaintiff and the Class for Foam-Filled Fenders and Buoys in the United States have been fixed, raised, maintained, and/or stabilized at higher, artificially-derived, non-competitive levels;

(b)    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the sale of Foam-Filled Fenders and Buoys in the United States; and

(c)    competition in establishing prices for Foam-Filled Fenders and Buoys in the United States has been unlawfully restrained, suppressed and eliminated.

130.   By reason of Defendants' violations of Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, Plaintiff and the Class have sustained injury to their business or property.  The injury sustained by Plaintiff and the Class

1  is the payment of supra-competitive prices for Foam-Filled Fenders and Buoys.

2  This is an injury of the type that the antitrust laws were meant to punish, prevent,

3  and redress.

## CLASS ACTION ALLEGATIONS

5      131.  Plaintiff brings this action as a class action under Rules 23(a), (b)(2)

6  and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others

7  similarly situated.  The "Class" is defined as:

> All persons or entities that purchased Foam-Filled
> Fenders and/or Buoys in the United States directly from
> one or more of the Defendants from June 1, 2000 through
> such time as the anticompetitive effects of the
> Defendants' conduct ceased (the "Class Period").
> Excluded from the Class are the Defendants, any of the
> Defendants' parents, subsidiaries or affiliates (whether or
> not named as a Defendant in this Complaint), any of the
> Defendants' co-conspirators, and federal government
> entities.

    132.  The Class is so numerous that joinder of all members is impracticable.
While the exact number of Class members is unknown to Plaintiff at this time,
Plaintiff believes that there are numerous members of the Class and that their
identities can be learned from Defendants' and their co-conspirators' books and
records.

    133.  Plaintiff's claims are typical of the claims of the Class.  Plaintiff and
members of the Class purchased Foam-Filled Fenders and Buoys during the Class
Period at artificially maintained, non-competitive prices, established by the
unlawful actions of Defendants and their co-conspirators.  Plaintiff and members
of the Class have sustained damage in that they paid inflated prices for Foam-
Filled Fenders and Buoys during the Class Period due to Defendants' conduct in
violation of federal law as set forth herein.

    134.  Plaintiff will fairly and adequately protect the interests of the
members of the Class and has retained counsel competent and experienced in class
action and antitrust litigation.

135.   Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   Whether Defendants conspired to raise, fix, maintain or stabilize the prices of, rig bids and allocate the markets for Foam-Filled Fenders and Buoys in the United States;

(b)   Whether Defendants undertook actions to conceal their unlawful conspiracies; and

(c)   Whether Defendants' conduct violated the relevant U.S. federal antitrust laws and caused injury to the business and property of Plaintiffs and the members of the Class and, if so, the proper measure of damages.

136.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of the members of the Class is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

137.   The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for members of the Class, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FRAUDULENT CONCEALMENT

138.   Defendants fraudulently concealed their participation in the conspiracy alleged by, among other things, engaging in secret meetings and

1   communications in furtherance of the conspiracy, and by holding themselves out as

2   competitors to the public, to Plaintiff, and to the members of the Class.  Because of

3   such fraudulent concealment, and the fact that a price-fixing conspiracy is

4   inherently self-concealing, Plaintiff and the members of the Class could not have

5   discovered the existence of the conspiracy any earlier than public disclosures

6   thereof.

7        139.   Throughout the Class Period, Defendants and their co-conspirators

8   affirmatively and fraudulently concealed their unlawful conduct from Plaintiff and

9   the members of the Class to prevent Plaintiff and the members of the Class from

10  suing them for the anticompetitive and unlawful conduct alleged in this Complaint.

11       140.   Defendants wrongfully concealed their conspiracy by various means

12  and methods that precluded detection, including but not limited to: secret meetings

13  and other surreptitious communications among Defendants in order to conceal the

14  existence and nature of their pricing discussions.

15       141.   Defendants agreed among themselves not to discuss publicly or

16  otherwise reveal the nature and substance of the acts and communications in

17  furtherance of their illegal conspiracy.

18       142.   Plaintiff and members of the Class reasonably relied on the

19  Defendants' materially false or misleading bids and Plaintiff and members of the

20  Class were lulled into believing that Defendants' bids were the result of free and

21  open competition, rather than the product of Defendants' collusive activities.

22       143.   Because the alleged conspiracy was both self-concealing and

23  affirmatively concealed by Defendants and their co-conspirators, Plaintiff and

24  members of the Class had no knowledge of the alleged conspiracy, did not know

25  that they were paying artificially high supra-competitive prices for Foam-Filled

26  Fenders and Buoys, and had no knowledge of any facts or information that would

27  have caused a reasonably diligent person to investigate whether the conspiracy

28  existed until April 6, 2006, the date that UPC filed an action against VHS, UPC

1    and MFI, among others, alleging that they had participated in a price-fixing, bid-

2    rigging and market allocation conspiracy involving Foam-Filled Fenders and

3    Buoys (the "Notice Date").

4         144.   At all relevant times and in all relevant respects, Plaintiff and

5    members of the Class exercised reasonable diligence.

6         145.   None of the facts or information available to Plaintiff and members of

7    the Class prior to the Notice Date, if investigated with reasonable diligence, could

8    or would have led to the discovery of the conspiracy alleged in this Complaint.

9         146.   As a result of Defendants' conduct and concealment of their

10   conspiracy, Plaintiff and members of the Class were prevented from learning of the

11   facts needed to commence suit against Defendants for the anticompetitive conduct

12   alleged in this Complaint until the Notice Date.

13        147.   Because of Defendants' active steps, including fraudulent

14   concealment of their conspiracy, to prevent Plaintiff and members of the Class

15   from suing them for the anticompetitive activities alleged in this Complaint,

16   Defendants are equitably estopped from asserting that any otherwise applicable

17   limitations period has run.

18        148.   The running of any applicable statute of limitations has been equitably

19   tolled as to any claims of Plaintiff and members of the Class as a result of the

20   anticompetitive conduct alleged in this Complaint.

21

22                    **FIRST CLAIM FOR RELIEF**

23             **<u>VIOLATION OF SECTION 1 OF THE SHERMAN ACT</u>**

24        149.   Plaintiff Ace Marine incorporates by reference the preceding

25   allegations.

26        150.   Defendants and their named and unnamed co-conspirators entered into

27   and engaged in a conspiracy in unreasonable restraint of trade in violation of

28   Section 1 of the Sherman Act and Section 4 of the Clayton Act.

151.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in which Defendants fixed prices, rigged bids and allocated the market and customers in the United States for Foam-Filled Fenders and Buoys.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

152.   Defendants' conspiracy, and resulting impact on the market in the United States for Foam-Filled Fenders and Buoys, occurred in or affected interstate commerce.

153.   As a proximate result of Defendants' unlawful conduct, Plaintiff Ace Marine and the Class have suffered injury in that they have paid supra-competitive prices for Foam-Filled Fenders and Buoys in the United States during the Class Period.

## **RELIEF SOUGHT**

Accordingly, Plaintiff demands relief as follows:

A.   That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff Ace Marine be appointed as class representative for the Class and that Plaintiffs' counsel be appointed as counsel for the Class;

B.   That the unlawful conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman Act;

C.   That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

1      D.    That Plaintiff and the Class recover the damages determined to have
2 been sustained as to each of them, trebled as provided by law, and that judgment be
3 entered against Defendants, jointly and severally, on behalf of Plaintiff and each
4 and every member of the Class;

5      E.    That Plaintiff and the Class recover their costs of the suit, including
6 attorneys' fees, as provided by law; and

7      F.    That the Court direct such further relief it may deem just and proper.

8                 **DEMAND FOR JURY TRIAL**

9      Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff
10 demands a jury trial as to all issues triable by a jury.

11

12 Dated:  October 13, 2010           Respectfully submitted,

13

14                                Michael Goldberg (Bar No. 188669)
15                                Lionel Z. Glancy (Bar No. 134180)
                                  **GLANCY BINKOW & GOLDBERG**
16                                **LLP**
                                1801 Ave. of the Stars , Suite 311
17                                Los Angeles, CA 90067
                                Telephone: (310) 201-9150
18                                Facsimile: (310) 201-9160
                                info@glancylaw.com

19                                Hollis L. Salzman
20                                hsalzman@labaton.com
                                Gregory S. Asciolla
21                                gasciolla@labaton.com
                                William V. Reiss
22                                wreiss@labaton.com
                                **LABATON SUCHAROW LLP**
23                                140 Broadway
                                New York, NY 10005
24                                Telephone: (212) 907-0700
                                Facsimile: (212) 818-0477

25                                Brian P. Murray
26                                bmurray@murrayfrank.com
                                Lee Albert
27                                lalbert@murrayfrank.com
                                **MURRAY, FRANK & SAILER LLP**
28                                275 Madison Avenue
                                New York, NY  10016

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone:  (212) 682-1818
Facsimile:  (212) 682-1892

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Ace Marine Rigging & Supply, on Behalf of Itself and All Others Similarly Situated | See attached. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Glancy Binkow & Goldberg LLP<br>1801 Avenue of the Stars, Suite 311<br>Los Angeles, CA 90067    Telephone: (310) 201-9150 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No        ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. Sections 1 and 15

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☑ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/ PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

SACV10-01553

| FOR OFFICE USE ONLY: | Case Number: _____ |
|---|---|

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s): 10-cv-2319

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or
  ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See attached. | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See attached. | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange<br>Los Angeles | Throughout the United States |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _[signature]_  Date 10/13/2010

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# CIVIL COVER SHEET ATTACHMENT

I (a) - Defendants

TRELLEBORG AB, VIRGINIA HARBOR SERVICES, INC., D/B/A
SEAWARD; SII, INC.; SHI, INC., FENTEK MARINE SYSTEMS GMBH,
URETHANE PRODUCTS CORPORATION, MARINE FENDERS
INTERNATIONAL, INC., WATERMAN SUPPLY COMPANY, INC.,
MARITIME INTERNATIONAL, INC., FRANK MARCH, ROBERT B.
TAYLOR, DONALD MURRAY, PETER NILSSON, GERALD THERMOS,
SEYMOUR WATERMAN, JOHN DEATS, TOMAS CRAWAACK AND
FENDERCARE LIMITED.

IX.  Venue - Section B

List the County in this District; California County outside of this District; State if
other than California; or Foreign Country, in which EACH named defendant
resides.

| County in this District: | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| **Orange** (Gerald Thermos)<br><br>**Los Angeles** (Marine Fenders International, Inc.; Waterman Supply Company, Inc.; Urethane Products Corporation; Seymour Waterman) | **Sweden** (Trelleborg AB; Peter Nilsson)<br><br>**Germany** (Fentek Marine Systems GmbH; Tomas Crawaack)<br><br>**United Kingdom** (FenderCare Limited)<br><br>**Virginia** (Virginia Harbor Services, Inc. d/b/a SEAWARD; Seaward; SII, Inc.; SHI, Inc.; Robert B. Taylor)<br><br>**Louisiana** (Maritime International, Inc.; John Deats)<br><br>**Tennessee** (Frank March)<br><br>**Delaware** (Donald Murray) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Andrew Guilford and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV10- 1553 AG (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Lionel Z. Glancy (SBN 134180)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ace Marine Rigging & Supply, Inc., On Behalf of Itself and All Others Similarly Situated. <br><br> PLAINTIFF(S) <br><br> v. <br><br> Trelleborg AB, Virginia Harbor Services, Inc., D/B/A Seaward; SII, Inc.; SHI, Inc., [See attached Exhibit "A" for Additional Defendants] <br><br> DEFENDANT(S). | CASE NUMBER <br><br> SACV10-01553  AG  MLGx <br><br><br> **SUMMONS** |

TO:   DEFENDANT(S): See attached Exhibit "B"


A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, __Lionel Z. Glancy_____, whose address is __1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.


Clerk, U.S. District Court

Dated: _____OCT 1 3 2010_____

CHRISTOPHER POWERS

By: _____
Deputy Clerk

(Seal of the Court)

SEAL


*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

SUMMONS [CONTINUED]


[Attachment of Additional Defendants]

FENTEK MARINE SYSTEMS GMBH, URETHANE PRODUCTS CORPORATION, MARINE FENDERS INTERNATIONAL, INC., WATERMAN SUPPLY COMPANY, INC., MARITIME INTERNATIONAL, INC., FRANK MARCH, ROBERT B. TAYLOR, DONALD MURRAY, PETER NILSSON, GERALD THERMOS, SEYMOUR WATERMAN, JOHN DEATS, TOMAS CRAWAACK AND FENDERCARE LIMITED.

1

## EXHIBIT "B" TO SUMMONS

2

3 [TO DEFENDANTS (CONTINUED)]

4

5 Trelleborg AB, Virginia Harbor Services, Inc., D/B/A Seaward; SII, Inc.; SHI,
Inc., Fentek Marine Systems GMBH, Urethane Products Corporation, Marine
6 Fenders International, Inc., Waterman Supply Company, Inc., Maritime
International, Inc., Frank March, Robert B. Taylor, Donald Murray, Peter Nilsson,
7 Gerald Thermos, Seymour Waterman, John Deats, Tomas Crawaack and
Fendercare Limited.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28